IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Case No. 07 CR 270-2 |
| | ) | |
| RASHAD LOGAN | ) | |

### MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 2007, Rashad Logan was prosecuted for his involvement in a so-called "stash house" sting that was devised by agents of the Bureau of Alcohol, Tobacco and Firearms (ATF) and a confidential informant. This operation was one of many that ATF undertook during that time period pursuant to a no-longer-used law enforcement tactic. Logan was found guilty by a jury, and on September 23, 2009, Judge Charles Norgle sentenced Logan to a mandatory minimum prison sentence totaling twenty-five years. Logan has served approximately fifteen years of that sentence. His anticipated release date, per the Bureau of Prisons website, is October 14, 2028. By 2018, Logan had exhausted all possible post-conviction remedies. In October 2022, Logan's case was reassigned to this Court following Judge Norgle's retirement. Logan has now filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A). For the reasons set forth below, the Court grants the motion and reduces Logan's sentence to time served.

### Background

This decision assumes familiarity with the controversy surrounding ATF's now-abandoned practice of conducting sting operations involving fake narcotics stash houses, as described thoroughly in the parties' briefs and in *Conley v. United States*, 5

F.4th 781 (7th Cir. 2021), which both parties discuss. In a nutshell, this tactic involved government agents, with the help of confidential informants (CIs), recruiting people—who were then encouraged to recruit others as co-conspirators—to engage in a robbery of a nonexistent narcotics stash house. The recruited defendants would be told that the fictional stash house contained a fictional quantity of drugs and posed a set of fictional barriers to committing the crime, such as armed guards who may need to be killed. The specific variables that the government created eventually would determine the mandatory minimum sentence that the defendants would face. This often resulted in lengthy mandatory minimum sentences. Once these tactics came to light, they drew widespread criticism for a number of reasons, including that they targeted individuals who may otherwise not have been involved in crime, facilitated the drug trade by securing real stash houses,[1] and allowed law enforcement to manipulate sentences by inventing the quantities and types of drugs that it claimed were kept in the fake stash house. Discovery of the government's tactics also led to the assertion of equal protection challenges, as the vast majority of those recruited under this scheme were poor people of color.

---

[1] As described by Judge Posner, "The effect of a fictitious stash house sting, when the person stung is, unlike [Logan], a real stash house robber, is therefore to make stash houses more secure by reducing the likelihood of their being robbed. A sting both eliminates one potential stash house robber (unless the defendant was entrapped) and deters other criminals from joining stash house robberies, since they may turn out to be stings. The greater security that fictitious stash house stings confer on real stash houses—security obtained at no cost to the operators of stash houses—reduces their cost of self-protection, which is a principal cost of the illegal-drug business. The lower a business's costs, the lower the prices charged consumers, and so the greater the demand for illegal drugs and the more sales and consumption of them. The operators of stash houses would *pay* law enforcement to sting potential stash house robbers." *United States v. Kindle*, 698 F.3d 401, 416 (7th Cir. 2012).

In 2006, ATF undertook one of these fake stash house stings, originally targeting the brother of Hurreon Sean Walker, who later became a co-defendant of Logan. When Walker's brother rebuffed the CI's attempt to involve him in the "robbery," the CI recruited Walker, who then recruited Logan. The undercover ATF agent, posing as a drug dealer, told Logan and Walker that drug dealers stored as much as eighty to one hundred kilograms of cocaine at the stash house and that it would be guarded by two armed men. On the day of the planned robbery, Walker, Logan, and the CI drove to a location where Walker picked up a firearm. The plan for the robbery was discussed in the car and recorded by the CI. The three then continued to the location of the purported stash house, where they were met by the undercover ATF agent. The men were then arrested. Logan later confessed to the planned robbery.

Logan and Walker were tried separately. On June 1, 2008, a jury convicted Logan of conspiring to possess more than five kilograms of cocaine with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2, and knowingly possessing a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c). The quantity involved triggered a ten-year mandatory minimum prison sentence for the drug offense, but because of Logan's prior conviction for a controlled substance offense, the government sought a sentencing enhancement under 21 U.S.C. § 851 that increased the mandatory minimum to twenty years. Even though it was Walker, not Logan, who possessed the firearm during the planned robbery, the violation of section 924(c) increased the mandatory minimum by another five years—resulting in a total mandatory minimum of twenty-five years. After finding Logan's total offense level was twenty-three and his criminal history category was VI, Judge Norgle sentenced

Logan to a total of twenty-five years in prison followed by ten years of supervised release. On October 10, 2008, a jury likewise found Walker guilty. The government has conceded that Walker was more culpable than Logan, but Walker got the same overall sentence as Logan: twenty-five years in prison followed by a ten-year supervised release term. On direct appeal, the Seventh Circuit affirmed Logan's conviction. *See United States v. Walker*, 673 F.3d 649 (7th Cir. 2012).

In 2015, in response to the increasing scrutiny surrounding ATF's investigative practices, prosecutors dismissed the most serious mandatory minimum drug charges against twenty-seven defendants charged in this district in connection with fake stash house stings. By 2017, ATF's tactics had been widely condemned in the media, by scholars, and by a number of judges. The U.S. Attorney's Office in this District subsequently stopped prosecuting stash house cases and offered plea agreements to the forty-three remaining defendants charged with stash house crimes. All forty-three defendants in what Logan refers to as the "litigation cohort" accepted the deals offered to them and received sentences—which, according to the chart prepared by Logan's counsel, *see* Def.'s Mot. for Compassionate Rel., Ex. C,[2] averaged out to about three years of imprisonment. Many also received time-served sentences, ranging from as little as six days for one defendant to nine and one-half years for the defendant in the cohort who had, at that point, served the longest amount of time in custody.

Because Logan had long since exhausted his post-conviction remedies, he was unable to benefit from the government's discontinuation of prosecution arising from the fake stash house stings and, more importantly, from the reduced prison terms other

---

[2] The accuracy of the chart is undisputed by the government.

4

similarly-situated defendants were offered and accepted.

On January 20, 2021, Logan's co-defendant, Walker, filed a motion for compassionate release. On August 11, 2022, Judge Norgle granted Walker's motion and resentenced him to time served, which amounted to about thirteen years. Logan now seeks a reduction in his sentence to time served, based on the subsequent disavowal of fake stash house operations, claimed unjust sentencing disparities that resulted, and his own rehabilitation.

## Discussion

Logan filed his motion under section 603(b) of the First Step Act, which amended 18 U.S.C. § 3582(c)(1)(A) to provide a greater role for courts in determining whether to reduce a defendant's sentence based on "extraordinary and compelling reasons" warranting a reduction. As amended, and as applicable here, the statute provides that

> [t]he court may not modify a term of imprisonment once it has been imposed except that—
>
> (1) in any case—
>
>     (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—
>
>         (i) extraordinary and compelling reasons warrant such a reduction;
>
>     . . .
>
>     and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

5

18 U.S.C. § 3582(c)(1)(A).

District courts are free to consider motions for compassionate release on grounds other than the categories of extraordinary and compelling reasons currently listed in U.S.S.G. § 1B1.13. *United States v. Gunn*, 980 F.3d 1178, 1179 (7th Cir. 2020). Moreover, in the Seventh Circuit, district courts may consider extraordinary and compelling reasons "jointly as well as severally," as multiple reasons may collectively serve as grounds for relief even if none of them does so independently. *United States v. Vaughn*, No. 22-2427, 2023 WL 2522728, at *2 (7th Cir. Mar. 15, 2023).

In *United States v. Thacker*, 4 F.4th 569 (7th Cir. 2021), the Seventh Circuit provided further guidance regarding district courts' consideration of section 3582(c)(1)(A) motions by setting out a two-step analysis:

> At step one, the prisoner must identify an "extraordinary and compelling" reason warranting a sentence reduction . . . Upon a finding that the prisoner has supplied such a reason, the second step of the analysis requires the district court, in exercising the discretion conferred by the compassionate release statute, to consider any applicable sentencing factors in § 3553(a) as part of determining what sentencing reduction to award the prisoner.

*Id.* at 756.

As a threshold matter, the government concedes that Logan has satisfied the administrative exhaustion requirement. He delivered a request for early release to the warden of his prison, FCI Terre Haute, on or about October 25, 2022. More than thirty days have elapsed since the warden received Logan's request.

The next question is whether there are "extraordinary and compelling reasons" warranting a reduction. Logan cites prosecutors' disavowal of fake stash house operations, the unjust sentencing disparities that followed this disavowal, and his

6

rehabilitation while in prison as extraordinary and compelling reasons that justify his early release. The government disputes that any one of these circumstances, alone or in combination, constitute an extraordinary and compelling reason for compassionate release. The Court concludes that Logan has met his burden to show the existence of an extraordinary and compelling reason warranting consideration of a reduction of his sentence.

A.   **Disavowal of fake stash house stings and resulting sentencing disparity**

The Court finds that Logan's continued incarceration for crimes that the government later deliberately ceased to prosecute in circumstances that are not materially distinguishable, and the "investigation" of which it has abandoned on a going-forward basis, constitutes on its own an extraordinary and compelling reason under section 3582(c)(1)(A). Even if that is not the case, the government's discontinuation of prosecutions arising from ATF's stash house sting operations and its resulting offer of reduced sentences to not-yet-convicted defendants resulted in significant sentencing disparities between Logan and other defendants whose cases are not materially distinguishable from his. That, too, qualifies as an extraordinary and compelling reason under the compassionate release statute. Because these two circumstances are inextricably linked, the Court addresses them together.

The fake stash house robbery operation used by ATF in Logan's and other cases has been abandoned and essentially disavowed. The government places the word disavowal in quotes when describing Logan's three bases for relief, but it does virtually nothing else to contest the notion that a disavowal of fake stash house investigations and prosecutions is what occurred back in 2015—2018. The government says that

"grounding such relief on disparities in the exercise of prosecutorial discretion, as defendant suggests, . . . would raise separation of powers issues." Gov't's Resp. at 13. The Court is not persuaded that the U.S. Attorney's Office's conduct vis-à-vis the twenty-seven stash house defendants whose charges it dismissed, and the forty-three stash house defendants to whom it offered favorable plea deals, can fairly be considered mere disparities in . . . prosecutorial discretion" divorced from any larger context. What occurred is, in the Court's view, extraordinary and compelling. Dozens of defendants who were subjected to the fake stash house operation have been granted significant relief based only on the fortuity that their criminal cases were still pending and open when the scheme was finally abandoned and disavowed. The Court agrees with its colleague Judge Sharon Coleman that, in a case like Logan's, "compassionate release [is] warranted based on the injustice and unfairness of a prosecution and resultant sentence" in comparison to the other similarly-situated defendants who were accorded significant relief. *United States v. Conley*, No. 11 CR 779-6, 2021 WL 825669, at *4 (N.D. Ill. Mar. 4, 2021) (granting compassionate release for a defendant convicted in connection with a stash house raid).

As matters stand right now, there are significant and unjustifiable disparities between Logan and other defendants in Chicago stash house cases, otherwise similarly situated, who were offered plea deals in 2018 as a result of the U.S. Attorney's Office change in position regarding stash house prosecutions. Despite "ATF ha[ving] a standard playbook for [their] operations, and the facts between cases [being] frequently nearly identical," Logan continues to be imprisoned while many others have been either released or resentenced to significantly lower sentences. *Kindle*, 698 F.3d at 404.

8

Based on the evidence offered by Logan, which the government does not dispute, some of the most culpable defendants in the litigation cohort were sentenced to a fraction of Logan's twenty-five year sentence (on average 3.9 years, with the lowest sentence twelve months and the highest nine and one-half years).  And for defendants like Logan who did not have a leadership role in the commission of the offense, by way of example the government's 2018 plea agreement with Matthew Webster stipulated to an offense level of twenty-three which, when coupled with Logan's criminal history category of VI, would yield a guidelines range of seven to nine and one-half years of imprisonment.  Again, Logan has already served fifteen years in prison.

An equally pertinent comparison involves Logan's co-defendant Walker.  Walker was undoubtedly the more culpable of the two, yet he was already granted early release by Judge Norgle, the sentencing judge.  (The Court acknowledges that Walker's release was largely premised on the severe health risks he faced in prison because of COVID.)

The government stakes much of its response in opposition to Logan's motion on Seventh Circuit caselaw that is not directly controlling.  In *Thacker*, the Seventh Circuit held that a nonretroactive *legislative* change to a sentencing law that results in a longer sentence for a defendant sentenced prior to the change does not by itself constitute an extraordinary and compelling circumstance under the compassionate release statute. *Thacker*, 4 F.4th at 574.  In *Thacker*, the Seventh Circuit expressed a concern that the discretion afforded to district courts under the compassionate release statute could allow defendants to circumvent mandatory minimum sentences prescribed by Congress "on the basis that the prescribed sentence is too long, rests on a misguided view of the purposes of sentencing, reflects an outdated legislative choice by Congress, and the

9

like." *Id.* The Seventh Circuit also expressed concern that those kinds of challenges "would allow the compassionate release statute to operate in a way that creates tension with the principal path and conditions Congress established for federal prisoners to challenge their sentences." *Id.*

The government contends that *Thacker* precludes compassionate release in Logan's case. The Court disagrees. Logan's case does not involve a legislative decision to make a favorable change in the law nonretroactive or on the proposition that the sentence was, simply, too long or too punitive in the first place or in retrospect. Rather, the situation here involves a decision by prosecutors, years after the fact, to offer favorable plea terms to nearly all similarly-situated defendants, but not to Logan and a handful of others by virtue of the fortuity that their cases were closed. The government first effectively renounced a problematic law enforcement tactic on which it had based dozens of prosecutions. Then it dropped the top charge for many defendants still charged with participating in fake stash house robberies and offered terms to others that allowed them to walk free. The government also stopped prosecuting these offenses going forward. This left a handful of individuals, like Logan, who were similarly situated to those given favorable terms but who nonetheless remain incarcerated. That differs materially from the situation in *Thatcher*.

Nor is Logan's motion foreclosed by *United States v. Brock*, 39 F.4th 462 (7th Cir. 2022), or *United States v. Martin*, 21 F.4th 944, 946 (7th Cir. 2021), as the government contends. In *Brock*, the Seventh Circuit held that a *judicial* decision that arguably constituted a change in law could not alone amount to an extraordinary and compelling circumstance, as holding otherwise would improperly convert the

compassionate release statute into a substitute for regular direct appeals or post-conviction motions. In *Martin*, the Seventh Circuit held that claimed errors in sentencing also could not, alone, serve as an extraordinary and compelling reason for compassionate release. But Logan does not rely upon an intervening judicial decision or an error in sentencing.

The Court concludes that it has the discretion under *Gunn* to consider the repudiated stash house stings, the ensuing conferral of favorable plea terms to other similarly situated defendants, and the unjust disparities that have resulted, as extraordinary and compelling reasons authorizing compassionate release. In this regard, the Court finds persuasive decisions by other judges in this district granting compassionate release motions filed by other defendants in stash house cases. *See, e.g.*, *United States v. White*, No. 09 CR 687-4, 2021 WL 3418854, at *4 (N.D. Ill. Aug. 5, 2021) (Leinenweber, J.) (granting release because "of the Government's changed policies surrounding stash house raid cases"); *Conley*, 2021 WL 825669 at *3–4 (Coleman, J.) (granting release and highlighting sentencing disparities between Conley and his codefendants and the "inherent unfairness and injustice" of stash house prosecutions); *United States v. Blitch*, No. 06 CR 586-2, Dkt. no. 666 (N.D. Ill. Apr. 13, 2022) (Leinenweber, J.) (granting release in part because "the Government no longer charges individuals for intent to distribute fictitious cocaine and the practice has been disavowed"). (The Court notes that it does not appear that the government appealed any of these decisions).

**B.    Rehabilitation**

The parties agree that, under controlling Seventh Circuit authority, a defendant's

11

rehabilitation alone cannot serve as an extraordinary and compelling reason warranting compassionate release. It may, however, be considered among other factors in the section 3582(c)(1)(A) analysis. *United States v. Peoples*, 41 F.4th 837, 842 (7th Cir. 2022).

Logan has presented strong evidence of his rehabilitation, which the government acknowledges and does little to dispute. *See* Gov't's Resp. at 14 ("[H]is demonstrated efforts at rehabilitation are extensive and commendable; and he has developed an apparently viable reentry plan."). The Court therefore considers this point effectively conceded. While incarcerated, Logan has taken advantage of every opportunity to not only better himself but also to positively impact others—both as a faith leader and through acts of service. He has also demonstrated a commitment to securing gainful employment upon release and denouncing his past life of unlawful activity.

Thus even if the issue discussed in the previous section is insufficient in and of itself to constitute an extraordinary and compelling reason warranting consideration of compassionate release, it qualifies when combined with Logan's rehabilitation.

**C.      Section 3553(a) factors**

When, as here, an imprisoned person establishes an extraordinary and compelling reason warranting consideration of compassionate release, the Court must consider the factors in 18 U.S.C. § 3553(a) in determining what reduction, if any, is appropriate. *See* 18 U.S.C. § 3582(c)(1)(A). These include the imprisoned person's history and characteristics; the nature and circumstances of the crimes; due consideration of the seriousness of the crimes; promoting respect for the law; providing just punishment; affording adequate deterrence; protecting the public from further

crimes by the imprisoned person; and providing him with any necessary services and treatment.

Logan was drawn into a life of criminal activity from a young age after he joined a street gang. Logan had several criminal convictions prior to the charges in this case. In fact, he was on parole for another drug offense when he was recruited to commit the robbery of the nonexistent stash house in 2007. Logan's criminal past is, without question, quite troubling. The Court agrees with Logan, however, that the government's assessment of the section 3553(a) factors in its response to Logan's motion reads as if the Court were sentencing Logan fifteen years ago. This disregards the time that has passed since then and any changed circumstances, all of which are appropriately considered. *Pepper v. United States*, 562 U.S. 476, 492 (2011).

In the fifteen years Logan has spent in prison, he has undergone what appears to be a significant change in his character. As a faith leader, worker, and helper to others around him, he has shown that he is trustworthy and able to handle responsibility. The record reflects that he has taken accountability for his past crimes and has renounced his gang membership. He has also put together, through counsel, a solid release plan, including employment options, housing, and familial support. Logan's motion is also supported by letters from people in his life who vouch for his ability to live a responsible and law-abiding life outside of prison. The material submitted on Logan's behalf indicates that he now has the ability to live life on the outside as a positive and productive member of society and to serve as an example to others in his community. At this point, it does not appear that he poses a significant danger to the community or others.

When he committed the offenses of conviction, Logan displayed a willingness to commit a very serious crime that could have caused significant harm. But at this point, he has served approximately fifteen years in prison, and he is already scheduled to be released in about five and one-half years. In the Court's view, the appropriate goals of sentencing—deterrence, retribution, just punishment, and rehabilitation—have been met. Reduction of Logan's sentence—given the lengthy prison term he has already served—will in no way deprecate the seriousness of his offense or undermine respect for the law. The Court also notes that because it will keep in place Logan's ten-year supervised release term, his liberty will be restricted in a significant way as he reintegrates into the community. And the Court will not hesitate to take appropriate action if, during the term of his supervised release, Logan strays back into the sort of criminal activity in which he was previously involved.

## Conclusion

For the reasons stated, the Court grants defendant Rashad Logan's motion for compassionate release under 18 U.S.C. § 3582 [dkt. nos. 239, 240] and reduces the defendant's prison sentence to time served. The Clerk will prepare an amended judgment. This order is stayed for fourteen (14) days to permit verification of Logan's anticipated residence, finalize his release plan, make appropriate travel arrangements, and ensure Logan's safe release. The ten-year term of supervised release and the previously-ordered conditions of release shall remain in place.

Date: April 3, 2023

_____
MATTHEW F. KENNELLY
United States District Judge